```
                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF IOWA
                          CENTRAL DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :
                            :
          Plaintiff,        :     Criminal No. 4:14-83
                            :
      vs.                   :
                            :
CARMEN HOCKING,             :     TRANSCRIPT OF SENTENCING
                            :
          Defendant.        :
- - - - - - - - - - - - - -X
```

```
                              Fourth Floor, South Courtroom
                              United States Courthouse
                              123 East Walnut Street
                              Des Moines, Iowa  50309
                              Tuesday, November 17, 2015
                              10:00 a.m.
```

BEFORE:  THE HONORABLE ROBERT W. PRATT, Senior Judge.


APPEARANCES:

For the Plaintiff:            KELLY E. MAHONEY, ESQ.
                             Assistant U.S. Attorney
                             U.S. Courthouse Annex, Suite 286
                             110 East Court Avenue
                             Des Moines, Iowa  50309-3899

For the Defendant:            ALFREDO G. PARRISH, ESQ.
                             Parrish, Kruidenier, Dunn, Boles,
                              Gribble & Gentry
                             2910 Grand Avenue
                             Des Moines, Iowa  50312


```
                   Terri L. Martin, CSR, RPR, CRR
                    United States Court Reporter
                      Room 189, U.S. Courthouse
                      123 East Walnut Street
                      Des Moines, Iowa  50309
```

E X H I B I T S

| GOVERNMENT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 1 - Spreadsheet for Iowa loss amounts | 10 | 29 |
| 2 - California loss calculations relating to PSR, paragraph 17 | 10 | 29 |
| 3 - California loss calculations relating to PSR, paragraph 16a | 10 | 29 |

1                        P R O C E E D I N G S

2                   (In open court, with defendant present.)

3                   THE COURT:  Please be seated.

4                   Good morning.

5                   MR. PARRISH:  Good morning, Your Honor.

6                   THE COURT:  Ms. Hocking, have you had the opportunity

7     to have read the report that was prepared in your case?

8                   THE DEFENDANT:  Yes, Your Honor.

9                   THE COURT:  And did you have time to talk to

10    Mr. Parrish about the report and about the issues that are

11    before me today?

12                  THE DEFENDANT:  Yes, Your Honor.

13                  THE COURT:  All right.  And, Mr. Parrish, did you have

14    the opportunity to have read the report?

15                  MR. PARRISH:  I have, Your Honor.  I have reviewed it

16    with Ms. Hocking on several occasions, including the most recent

17    update with a few minor changes that came in late yesterday.  We

18    reviewed it early this morning.

19                  THE COURT:  All right.  And I appreciate your brief

20    that you filed.  It was very detailed and helpful to me in

21    understanding the issues.

22                  Ms. Mahoney, on behalf of the United States, have you

23    read the report in this case?

24                  MS. MAHONEY:  Yes, Your Honor.

25                  THE COURT:  Okay.  And as well, Ms. Mahoney, thank you

1   for your report.  And I don't know the way each of you want to

2   proceed here.  I think there's agreement on the guideline

3   between the government and the defendant even though it differs

4   from the presentence writer's guideline.

5          Am I understanding correctly?

6          MS. MAHONEY:  Yes, Your Honor.

7          MR. PARRISH:  I believe that is correct, Judge.

8          THE COURT:  And my sense is that you're both right

9   about the guideline.  It's probably a matter that reasonable

10  people could disagree on, and since I have two experienced

11  lawyers, particularly with the guideline application, I'm going

12  to agree that the guideline is as the plea agreement

13  contemplated.  And here is my understanding.  The wire fraud

14  offense is seven.  The amount of the loss takes it to 21.

15  There's three for acceptance, but in this case, because the

16  defendant did cooperate so early, there was no need to convene a

17  grand jury and, therefore, the government and the parties have

18  agreed that there's an additional point for acceptance of

19  responsibility.

20         So I end up at 17, and the defendant has no criminal

21  history.  So the 2015 guideline, because we're sentencing after

22  November 1st of 2015, is 24 to 30.

23         Am I correct with both the government and the

24  defendant?

25         MS. MAHONEY:  Yes, Your Honor.

1          MR. PARRISH:  That is correct, Judge.

2          THE COURT:  All right.  And so I'm going to find on

3    the record that the applicable offense level is 17 after giving

4    the defendant credit for her extraordinary acceptance of

5    responsibility, and the Sentencing Commission would advise that

6    the appropriate sentence is somewhere between 24 and 30.  And as

7    both of you know, that's one of the 3553(a) factors that I have

8    to take into account.

9          So having said that, Ms. Mahoney, I'm going to proceed

10   this way unless you or Mr. Parrish want to go some other way.

11   You filed a motion under 5K1.1.  So do you want to rest on your

12   motion or do you want to supplement that by some remarks here

13   this morning?

14         MS. MAHONEY:  Your Honor, I would just briefly

15   supplement it.  I'm happy to answer any questions if the court

16   has any in addition to that; but Ms. Hocking's information,

17   essentially it helped fill in holes, a lot of holes in the

18   investigation in California.  The case out there which has

19   charged Mark Friend is currently scheduled for trial -- there's

20   actually a scheduling conference in December.  They anticipate

21   trial will be set in the spring, which I think may be around

22   March or April.

23         The government is not positive they would call

24   Ms. Hocking to testify at that trial because the case is built

25   largely upon documents, but she may be called to testify to kind

1    of help provide, again, an overview and fill in the holes and

2    the gaps in the documents and the case.  If she were called to

3    testify, the government would anticipate there would likely be

4    another substantial assistance motion.  Otherwise I don't

5    believe -- I believe this would be the only motion that the

6    government would file, and it tries to take into account the use

7    of her information, first of all, in bringing charges but also

8    with any potential resolution that involves her not testifying,

9    either by trial without having to go out there to testify or if

10   there's a plea entered.

11         So I would be happy to answer any other questions you

12   may have about her cooperation and the motion in general, but

13   otherwise I rest on the motion in this case.

14         THE COURT:  Let me ask you, you can tell me, you've

15   been with the office for a long time, is it often that you

16   forego the need to convene a grand jury in a case this serious

17   or is this extraordinary?

18         MS. MAHONEY:  No, I think it was extraordinary.

19         THE COURT:  Okay.

20         MS. MAHONEY:  I would expound upon the fact that

21   Ms. Hocking interviewed with the government on multiple

22   occasions.  Most of it was done by video conferencing from my

23   office with the agent and AUSA out in California and Ms. Hocking

24   and her counsel.  I would also note that she allowed -- she

25   provided documentation that she had in her possession and she

1  also allowed the government access briefly to her e-mail account

2  I think to obtain some additional documents that may have been

3  there, which is incredible.  I've never seen that done actually,

4  so that was unusual also.

5        THE COURT:  All right.  Thanks very much.

6        Mr. Parrish, do you want to talk about the 5K1.1

7  motion, or do you want to wrap it with the rest of your

8  arguments, or how do you want to handle it?

9        MR. PARRISH:  I could make just a couple of brief

10  comments on it right now, Judge.

11        THE COURT:  Yes.

12        MR. PARRISH:  As the court has pointed out, this is an

13  unusual process where the individual provided extraordinary

14  information.  However, we believe, Judge, it actually started

15  before that, and I know Ms. Mahoney came into this case after

16  Mr. Locher left.  I was involved in the case prior to that time.

17  We had a couple of sessions -- I don't know whether she found it

18  in her notes or not -- where we came over I think prior to any

19  charges coming up in California.  It may have been me who also

20  initiated the contact in California where they indicated they

21  may want her to come out there because, as you know, there was

22  charges pending out there and there were charges pending here.

23  She came down and we went through all of the information that

24  she had provided with regard to her conduct here in Iowa, and

25  the reason it was delayed initially is because they indicated

1    that they may need her assistance out in California earlier.

2              So it actually started before those debriefing

3    sessions that we ultimately ended up with after her plea.  So we

4    think some additional credit should be given to her based upon

5    her earlier cooperation.  So I just wanted to put in context

6    that I know Ms. Mahoney didn't do it, but it's probably in her

7    file that we actually came down and had several meetings with

8    Mr. Locher before he left the office.

9              THE COURT:  Okay.

10              MS. MAHONEY:  Your Honor, I can clarify that.  Agents

11    attempted to interview Ms. Hocking on September 2nd of 2011.

12    She obtained the representation of Mr. Parrish and they

13    interviewed her I believe on October 9th of 2012 with

14    Mr. Parrish, and that was obviously prior to her being charged.

15    That was, of course, useful in our prosecution of her.

16              THE COURT:  All right.  Thank you.

17              Okay.  And I'm not understanding correctly from the

18    memo I got from probation.  Is there agreement on the amount of

19    the restitution or not?

20              MR. PARRISH:  We talked about that and Ms. Mahoney can

21    address that, Judge.  I think we are.

22              THE COURT:  Okay.

23              MR. PARRISH:  On the amount of -- I'll tell you what

24    was going back and forth.

25              THE COURT:  Okay.

1          MR. PARRISH:  There was some numbers added in, and

2    when we were sending e-mails between the three of us, there were

3    some clarifications coming in from John Vincent out in

4    California, and I think we've kind of worked that through now.

5    And when I got back from Marshalltown yesterday, Ms. Mahoney had

6    sent me some additional materials.  So I think we're on the same

7    page on the matter of restitution.

8          THE COURT:  All right.  Let me just tell you what I

9    think I understand the loss amount to be, and then you correct

10   me if I'm wrong.  We can make a record on this.  I have the

11   National Mortgage losses out in eastern California and then I

12   have six amounts from FHA.  The National Mortgage amount, I have

13   455,123.  The six FHA loss amounts, I have 336,897.74.

14   Therefore, I have a total loss amount and mandatory restitution

15   amount of 792,507.50.

16         MR. PARRISH:  I think, Judge, let me make sure I'm

17   right here.  Page 9, I believe it is -- what was your number for

18   FHA, Judge?

19         THE COURT:  The six FHA losses I had $336,897.74.

20   That's based upon the paragraphs 22 through 27 --

21         MR. PARRISH:  Okay.

22         THE COURT:  -- the amounts that were listed there.

23         MR. PARRISH:  Is that the number you ended up with,

24   Kelly?

25         MS. MAHONEY:  I think that's very close to what we

1   have, Your Honor.  I apologize, I was still putting numbers

2   together as of yesterday.

3           THE COURT:  No, that's all right.

4           MS. MAHONEY:  If I could have just one moment?

5           THE COURT:  Yes.

6           (Pause.)

7           THE COURT:  Okay.  I was missing $486.76.  So now I

8   have the National City Mortgage, the eastern California amount

9   is 455,609.76, which is the two items of the 455,123 plus

10  486.76.

11          MS. MAHONEY:  And I have for the court, too, which

12  these were provided to probation in advance, and these were

13  numbers reflected in the PSR, but Government's Exhibits 1

14  through 3.

15          Government Exhibit 1 is spreadsheet for the Southern

16  District of Iowa loss amounts, and then Exhibits 2 and 3 are the

17  loss statement from California.

18          Exhibit No. 2 specifically would refer to the

19  presentence report, paragraph No. 17, I believe, and up toward

20  the top it has the property address which is reflected in the

21  PSR also.

22          Exhibit No. 3 would reflect the loss amount for

23  paragraph 16a of the PSR.

24          For the Government's Exhibit, Exhibit No. 1, the first

25  green column of $352,325.03 is fairly close to the loss amount I

1  think the government would request for restitution.  It does

2  include interest.  So we were actually working on figuring out

3  what the interest amount was, if the court would just reduce it

4  by that amount; but that would include the costs that the bank

5  was required -- or the FHA was required to expend in order to

6  maintain the property during the foreclosure and pending the

7  sale.

8           So I think the second green column of $195,322 is too

9  low because it doesn't recognize those costs that I think the

10 bank or FHA would be entitled to for restitution; but the -- and

11 the court's number was a little bit below that, so it may be

12 that that's the correct number, but we just need a second -- we

13 can provide additional information providing what interest was

14 included in the total amount of $352,325 if the court wishes.

15          THE COURT:  Okay.  Well, the best thing for me is for

16 you two to agree, or not.  If you can't agree, I can decide it;

17 but if you can agree, that, obviously, is preferred to coming

18 back here and doing this again or me making an erroneous

19 finding.

20          (Pause.)

21          MR. PARRISH:  Judge, we're willing to do this, I

22 think, perhaps work up some numbers.  We've been exchanging

23 numbers back and forth, and we need to figure out -- I don't

24 think we're that far off on the numbers.  So we can submit that

25 to the court, if you might give us maybe seven days.

1           THE COURT:  All right.

2           MR. PARRISH:  Is that okay with you?

3           THE COURT:  Okay.  We'll do that.

4           Okay.  The law, Ms. Hocking, gives you an opportunity

5    before I hear from the lawyers about what they think the

6    sentence is that is sufficient but not greater than necessary,

7    which I have to do under the law.  The law also gives you, as

8    I'm sure Mr. Parrish has told you -- you can remain seated.  The

9    law gives you an opportunity to make any remarks you want.  It's

10   called your right of allocution under our rules.  So if you want

11   to say something, you can.  You are under no obligation to say

12   anything.

13           Do you have anything you would like to say?

14           THE DEFENDANT:  No, Your Honor.  I just want to --

15           (Counsel conferring with defendant.)

16           THE COURT:  You can, but you don't have to say

17   anything, but you do have an opportunity to do so.

18           THE DEFENDANT:  Yes, I do.

19           THE COURT:  And if you're more comfortable sitting,

20   you can sit.  If you would rather stand, you can stand.

21           THE DEFENDANT:  I can stand, Your Honor.

22           THE COURT:  All right.

23           THE DEFENDANT:  Thank you.

24           THE COURT:  All right.

25           THE DEFENDANT:  I just want to -- I know you only saw

1  me on paper, but you never saw me, and I just want you to know

2  that I'm so proud to live in this country.  I love this country.

3  I love Iowa.  That's why I choose to go back here.  I'm feeling

4  really shame on myself.  I'm married to a great man who works in

5  the law.  I learned the law from him.  And one of the things I

6  learned is to love the country because in California, my in-laws

7  were in the service in the second war, I had told my

8  mother-in-law I'm so proud to be married to her son because it

9  taught me how to love the land.

10       What I did I know was wrong.  I bring shame on my

11  family.  I'm embarrassed of myself.  I know there are people

12  that knows me that respect me.  I hope they understand and they

13  forgive me for what I did.

14       I have two kids and I have my family here, and to

15  them, especially my brothers, their families, they respect me

16  for everything I was in because they came after me.

17       I appreciate the help of Mr. Parrish and he gives me

18  kind words all the time to give me comfort, but I know what I

19  did is wrong.  My intention was not to hurt anybody.  It was

20  never to do anything wrong to hurt anybody.  I -- sometimes with

21  things, without thinking or without realizing the consequence,

22  and I know the good Lord teaches that when you do something

23  wrong, you have to be prepared for the consequence.  I think

24  today is my time to realize that, and I just want -- I know the

25  Lord forgives me, and I hope and I just pray every single day

1 that the people that I hurt, they forgive me, too.

2           All this time since this has been really hard.  I've

3 been in pain and the pain that -- you know, when I see people

4 and you don't know them and I've been thinking what would that

5 person go through or when people would talk to me they would

6 just know what I've been going through.  There's not a day that

7 I don't wake up with my morale soured, scared, thinking of my

8 family and what I brought to them.

9           I just want to ask for forgiveness, and I just feel so

10 sorry, sorry and embarrassed of what I did.  I know that

11 whatever happens to me is going to affect my family

12 tremendously.  I'm going to mar my kids for life and my husband.

13 I cannot imagine the night after this for him or for anybody in

14 his family.  My co-workers, I've been blessed.  I've been

15 blessed to be working with the people that I work, and it's not

16 that they didn't appreciate it when I did this, but it was not

17 my intention to do any harm.  There was not.

18           I'm just so sorry and I just want to live the life --

19 I changed, and I changed completely and I just want to live a

20 life of -- a better life for everybody, a better life to

21 understand the kindness -- I just want people to have some

22 compassion for me, and it's not as much as for me but for my

23 family.  I know they're going to suffer.  I know they're going

24 to suffer.  We live together.  We love each other.

25           And I'm so sorry, Your Honor.  I'm sorry.  I want to

1   say sorry to everybody in this country because they gave me the

2   chance to come here and I think I've failed.  I failed and I'm

3   just sorry.  I apologize to you, to my husband, to my kids, to

4   everybody that knows me.

5           THE COURT:  All right.

6           THE DEFENDANT:  Thank you for giving me the

7   opportunity to tell you.

8           THE COURT:  Thank you very much.

9           Okay.  Ms. Mahoney, I would hear from the government,

10  although you've told me I think in your brief what you think a

11  sufficient sentence is; but if you want to elaborate on those

12  remarks, though, you may certainly do so.

13          MS. MAHONEY:  Sure, Your Honor.  And I think there's

14  no need to go any higher than the starting point of the

15  guideline range in this particular case, and we tried to reach a

16  point where it did take into consideration the cooperation of

17  Ms. Hocking, as well as her conduct in this prosecution which

18  made it very easy for the government to move forward in this

19  case.  We do recommend the low end of the guideline range, and

20  the recommendation for the cooperation is 35 percent with -- you

21  know, obviously there's a possibility there may be an additional

22  motion, but there also may not be in the future.

23          So if you have any other questions or want me to share

24  any further comments, I would be happy to answer them; but

25  otherwise I submit it with that.

1            THE COURT:  And it's still the government's position

2    that a prison sentence is appropriate?

3            MS. MAHONEY:  Yes, Your Honor.

4            THE COURT:  And, Mr. Parrish, I'll hear from you about

5    what sentence the defendant believes is sufficient but not

6    greater than necessary.  And I did want to -- before you get

7    into that, if you could specifically tell me, I had a couple

8    of -- I've talked with the government about this before; but you

9    made two points that I want to ask you about.

10           One, you quoted Judge Bright talking about the expense

11   of imprisonment, and I've had this discussion with counsel for

12   the government and other defense lawyers.  My understanding of

13   our law here in my circuit and your circuit is that I can't take

14   that into account because there's an earlier Richard Arnold

15   opinion on that, and so I know that other circuits say that we

16   should, Judge Posner in particular.  And so that's one question

17   that I have.

18           Secondly, Judge Tunheim got reversed in a case called

19   United States versus Ture, T-U-R-E, where one of your arguments

20   here about Ms. Hocking is, Judge, she's got a mandatory

21   restitution requirement, she can't be making restitution when

22   she's deprived of her liberty by a prison sentence.  Judge

23   Tunheim got reversed on that case.  The court said, well, you

24   can't use that rationale -- because he did use that rationale to

25   give probation.  I think it was a tax case.  And the Court of

1    Appeals said, if you use that rationale, the more a person

2    defrauds victims, the more likely it is that they would be

3    entitled to probation.

4            So those are two legal problems that I see.  I don't

5    want to concentrate on those because I know there are so many

6    other issues that you've raised about nature and circumstances

7    of the offense and history and characteristics of the defendant,

8    and your brief was very helpful to me in understanding those

9    factors.  But just from a legal standpoint, you know, those are

10   concerns that I had about, you know, the expense.  If I use the

11   expense as a rationale, I would think -- at least I think I

12   would be committing legal error.  And perhaps if the government

13   wants to weigh in here because I've raised these after the

14   government spoke, I'll hear from the government as well; but

15   those were a couple of concerns I had that if you want to

16   supplement your brief, you may do so, but you don't have to.

17           MR. PARRISH:  Okay.  Would you like me to start with

18   those two points, Judge?

19           THE COURT:  However you think is best.

20           MR. PARRISH:  Probation knows I've been dealing with a

21   couple of issues like this that have been floating through the

22   system on the ability to pay back if, in fact, the individual is

23   incarcerated and whether or not the court can use that as some

24   factor.  I would probably use it more to supplement the fact of

25   history and characteristics that they made some efforts to pay

1  back, have they shown some remorse, have they shown some other

2  factors that were helpful that you can tie into, well, this is a

3  person under the 3553(a) factors who should get that opportunity

4  based upon their life history to do that.

5          And then I would also make that same argument with

6  regard to the -- I believe you mentioned the pure costs of

7  prison.  As you know, we -- in our briefs we try to address that

8  solely as a point to push the courts forward on this idea that

9  if you compare nonviolent offenders' productivity outside of the

10 system as opposed to even a 12-month-and-a-day, which seems to

11 be the kind of sentence that the courts tend to lean toward, the

12 advantage I think goes to the nonviolent offender being outside

13 of the system during that period of time.  The costs of travel,

14 the costs of incarceration, the costs to the family, which is

15 not even included in that cost, being separated from their

16 family when they may need the key breadwinner, those are all

17 factors that we think the court ought to take a look at, not

18 solely the pure cost of incarceration but the costs associated

19 with that to the offender, too.  That's why we think the court

20 ought to take a look at it.

21          THE COURT:  So your argument is on expense, it's just

22 not the part of the probation report that refers to the yearly,

23 monthly, and daily costs of incarceration; you're saying the

24 private loss to the family and the defendant/wage earner that a

25 noncustodial sentence would yield as opposed to a custodial

1  sentence?

2          MR. PARRISH:  Correct.  And it ties into the 3553(a)

3  factors also.

4          THE COURT:  You're trying to keep me from getting

5  reversed.

6          MR. PARRISH:  Correct.

7          THE COURT:  Okay.  I think I understand.  Your

8  argument is broader than the costs of incarceration.

9          MR. PARRISH:  Correct.

10         THE COURT:  All right.  Thank you.

11         MR. PARRISH:  Judge, let me start with one point with

12  regard to Ms. Hocking.  When I first met with Mr. Locher, we

13  brought out after she told me certainly without knowing the full

14  development of what had happened in California, which I think

15  will go to the overrepresentation of the loss factor in the

16  California case; but when I first interviewed her and she was

17  going through the background of these cases and looking at her

18  clientele, these were people who were on the threshold, which

19  everybody pretty much acknowledges, including FHA, where they

20  had to have this additional amount of money to make this loan

21  work.  What she did in her misconduct was provide this money to

22  them and not disclose to the government through these forms that

23  she was the person who had done that.  Throughout this time --

24  and she acknowledges her misconduct; but what she did was

25  provide them the extra thousand dollars or $1,500 indicating it

1   was from a relative or a friend or a family member as opposed to

2   coming from her, and these were the loans that ultimately were

3   foreclosed on.  But these folks who she's talked about were

4   people who had never owned a home before, who never would have

5   had an opportunity to own a home.

6           And so, to some extent, even though she did make some

7   income, which we are not denying, she was trying to help these

8   folks because if you look at her history when she came into this

9   country, she was trained basically as a secretary, and she was

10  able to make some degree of success from that training.  Her

11  overall goal, even though it was incorrect, was to sort of help

12  these folks so they could buy homes, and they were people who

13  became her friends, who obviously referred other people to her

14  and who entered a home for the first time.

15          Now, unfortunately, Judge, as we all know, some of

16  these people were not able to keep up the loans, and I'm sure

17  FHA's argument, which does make sense logically, is that had she

18  not provided that these people would have never qualified and,

19  consequently, these foreclosures would have never taken place.

20          But we all know, those of us who have bought homes

21  over the years, that there are things such as family letters

22  that they write and people who have these people who can provide

23  2,500 bucks or $3,000, they provide it.  But that was the

24  essence of what she did here in Des Moines.

25          In California -- and I won't bore the court with the

1  details because we laid it out in our brief as to what her

2  conduct was, and that goes to the overrepresentation argument.

3  In this instance we know that the individual who's now been

4  indicted and facing trial is the person who did all of the

5  paperwork, who will be jointly and severally liable, and we

6  think that was kind of an overrepresentation.  The bank made an

7  enormous amount of money.  This person was a bank officer who

8  actually did the paperwork, who met with the people, who was

9  well aware.  So I realize it goes to restitution because she and

10  the other person, if that person is convicted, would have to

11  share in that payback; but in terms of the elements of the

12  conduct itself that led to the loss amount, that loss amount

13  should be joint and severally liable for both of these persons.

14  Therefore, it's an overrepresentation on that level.

15          Also, there is some intervening causes here that we

16  point out in our brief, and one was that clearly these

17  individuals who actually signed off on the paperwork got the

18  benefit of that property even for a short period of time.  Had

19  they continued making their payment, this would not have

20  occurred.  I'm not saying the misconduct did not occur, because

21  we agree with that; but they didn't continue to make their

22  payments.  So that was an intervening cause to some extent that

23  leads to the overrepresentation of this high amount because what

24  we would love to have the court look at it as a 550,000 under

25  the new guidelines, and that's what we kept arguing in our

1  brief, and I kept calling Ms. Mahoney, can't we do that, can't

2  we get it down to that?  Because it does go into the charge

3  bargain when the court has an opportunity to look at it that way

4  as opposed to the $800,000 that we know that we're looking at.

5          We believe, Judge, that those two factors show that it

6  was an overrepresentation, the loss amount based upon what her

7  conduct was, because her conduct never could have been

8  accomplished, though wrong, without the bank's participation or

9  the bank officer's participation, who did make a lot of profit.

10         The third part of that equation, Judge, is that if you

11 look at what her commission was in relation to the overall loss

12 amount, there's such a great difference there that, again,

13 that's an overrepresentation, because if you look at her

14 commission, which was pretty minimal, even though she made it

15 and, again, even though it was wrong and she's acknowledged that

16 and is very remorseful about it, if you compare what she made in

17 terms of what the loss amount comes out to be when -- we've made

18 these arguments all along to Mr. Vincent and everyone else, that

19 property values in California were up at that point and so

20 that's the amount that you value it at.  So if you look at

21 California property values at that point and look that the

22 bottom fell out at some point, that loss amount is

23 overexaggerated.

24         So we believe that those factors should come into your

25 analysis when you look at the loss amount, which gives you

1   grounds I believe to depart and give her at least some

2   consideration for a probationary sentence.

3          I think her background, Judge, is remarkable.  The

4   fact that she had this modicum of success, considering her lack

5   of a good education, training, she learned a lot on her own.

6   She went to real estate school.  She worked as a secretary at a

7   company, a receptionist for a while, and she basically, as she

8   has indicated, did everything to improve her life.  And,

9   obviously, she had some difficulties when she ran into these

10  real estate problems.

11         So based upon that, Judge, under the 3553(a) factors,

12  she's never been in trouble as the court has pointed out and

13  she's pointed out.  She was very remorseful.  She came in and

14  did everything in her power to try and work this out with the

15  government, hopeful initially that perhaps charges wouldn't be

16  filed, but obviously they were.  But she then continued her

17  cooperation after that, pleading both to the charge out in

18  California and the one here in Iowa.  And she has never failed

19  in her cooperation.  She has never so much as winced when asked

20  these difficult questions and I think at this point that she

21  even allowed government access to her e-mails, which they didn't

22  have, which provided some insight into what the bank and the

23  bank officer was doing out in California, and that was enormous

24  and extraordinary.

25         For those reasons, Judge, we think the court should

1  give consideration to probation or some form of probation

2  combined with house detention, which we believe is sufficient

3  and no more than necessary.  It would be unlikely, Judge --

4  she's 64 years old.  The last -- I think in March of this year,

5  she's indicated to me that she was so stressed out by this she

6  spent about a week-and-a-half in the hospital under stress.  In

7  the presentence report, she had never had counseling before in

8  her life.  Now to assist with her depression, she went through

9  counseling.

10         We believe for those reasons, Your Honor, the court

11  should consider some form of probation for Ms. Hocking.

12         THE COURT:  All right.

13         MR. PARRISH:  Thank you, Judge.

14         THE COURT:  Thank you very much.

15         The record should show the court has read the

16  presentence report, the memorandum submitted by the government

17  and the defendant.  The court earlier agreed with the counsel's

18  calculation of the advisory guideline offense level of 17, a

19  criminal history category I under the 2015 guideline, which the

20  court is using.  The Commission advises that the appropriate

21  sentence is somewhere between 24 and 30 months.

22         The court has a motion from the first matter from the

23  guideline is the 5K1.1 motion of the government.  The government

24  says the defendant is entitled to a 35 percent for her very

25  timely cooperation.  The court is going to reduce -- from the

1  bottom of the guideline, the court is going to reduce the

2  sentence by 40 percent.  So I'm going to be going from 24 to 15.

3       The court then must apply the 3553(a) factors that are

4  contained in the sentencing statute.  The two principal ones are

5  the nature and circumstances of the offense, here a long running

6  practice of the defendant to help out prospective purchasers of

7  real estate both in eastern California and southern Iowa.

8       The nature and circumstances of the offense indicate

9  that it's a very serious offense given that Congress believed

10  that the maximum sentence should be 30 years.  This is among the

11  most serious offenses that the government prosecutes here.

12       The history and characteristics of the defendant, by

13  all accounts the defendant has a compelling personal narrative,

14  including her work ethic, her devotion to her family.  Her

15  remorse and shame is obvious from her coming forward to

16  cooperate with the government early, and her allocution further

17  confirms to the court her remorse and sincerity.

18       The court is going to reduce the sentence from 15

19  months to six months imprisonment.  The court believes that this

20  serious offense with these consequences and the other 3553(a)

21  factors merit a sentence of incarceration that will reflect the

22  seriousness of the offense and promote respect for the law as

23  well as provide just punishment for the offense.

24       The court notes in her allocution I don't believe that

25  the defendant disagrees that some punishment is appropriate

1  here.  This will provide both adequate deterrence to further

2  criminal conduct.  I don't think the public needs further

3  protection from his defendant.  She doesn't appear to be likely

4  to be back before the criminal justice system.  She needs no

5  educational or vocational training, no medical care that the

6  court is aware of.

7          The court is going to permit, because I didn't see any

8  objection to this, the defendant the privilege of

9  self-reporting.  The court is going to permit the defendant to

10 self-report to a federal correctional facility assigned by the

11 Bureau of Prisons by January 26th -- oh, I'm going on '14 here.

12          The defendant will be allowed the privilege of

13 self-reporting to a federal correctional institution designated

14 by the Bureau of Prisons on or before January 20, 2016.  If that

15 doesn't happen, if we don't have a designation, Mr. Parrish,

16 from the BOP or, Ms. Mahoney, you get ahold of my office, we'll

17 extend the date of her self-report.  On the other hand, if the

18 case goes to trial in eastern California or pleads, maybe you

19 want to give me further information under Rule 35.

20          Upon release from imprisonment, the defendant shall be

21 on supervised release for a term of five years as to Counts 1

22 and 2 of the information that the government filed.  These will

23 be served concurrently.  The defendant must report to the

24 probation office in the district to which she's released within

25 72 hours of her release.  The defendant shall not commit another

1  federal, state, or local crime.  The defendant shall not

2  unlawfully possess a controlled substance.  There's no drug test

3  requirement.  I didn't see any need for a drug-testing

4  requirement in any of the presentence report.  The defendant

5  shall not possess a firearm, ammunition, destructive device, or

6  other dangerous weapon.  The defendant shall cooperate in the

7  collection of her DNA.

8          Counsel, if you'll look at paragraphs 101, 103, 104

9  and 106, those seem to me to be appropriate conditions of

10 supervision that I'm going to place in the judgment, unless

11 there's some record here that either of you think are

12 inappropriate issues, we should probably discuss it now as

13 opposed to having had some appeal be taken from the judgment.

14         Ms. Mahoney, does the government have any objection to

15 any of those paragraphs being made special conditions of

16 supervision?

17         MS. MAHONEY:  No, and I think they're appropriate.

18         THE COURT:  All right.  Mr. Parrish, do you see

19 anything inappropriate about the use of those?

20         MR. PARRISH:  Did you say 101, 102 --

21         THE COURT:  No, no; 101, 103, 104, 106.

22         MR. PARRISH:  Okay.  No, Your Honor.

23         THE COURT:  Okay.  The determination of restitution is

24 deferred pending receipt within seven days of today's date from

25 counsel who indicate they're in agreement with what amount

1    should be placed in the J & C.  The defendant must make

2    restitution to the payees that include PNC Bank in Pittsburgh

3    and the Financial Operation Center of the Federal Housing

4    Administration in Albany, New York.  The court determines the

5    defendant does not have the ability to pay interest, and I order

6    the interest amount therefore waived.  In addition to the

7    restitution amount, the court orders a $100 special assessment

8    be ordered paid by the defendant.

9          The court adopts the presentence investigation with

10   the change that I did not assign two additional offense levels

11   for abuse of a position of trust.

12         Mr. Parrish or -- oh, it's a $200 special assessment.

13   There's two counts of conviction.

14         Mr. Parrish or Ms. Mahoney, are there any other

15   matters the court has to attend to before I advise the defendant

16   of her right of appeal?

17         MS. MAHONEY:  No, Your Honor.

18         MR. PARRISH:  No, Your Honor.

19         THE COURT:  All right.  Ms. Hocking, this is a final

20   judgment of the district court.  You have a right to appeal the

21   judgment to the Court of Appeals if you think it contains error.

22   If you want to take the appeal, you have to file a written

23   notice with the Clerk of Court, serve a copy on the U.S.

24   Attorney's office.  You have to do all of that within 14 days.

25         The law further requires that I inform you that if you

1    want a lawyer to help you with the appeal and you can't afford a

2    lawyer, I have to appoint a capable lawyer to represent you on

3    the appeal.

4           Ms. Hocking, do you have any questions about the

5    judgment that's been entered today, your privilege of

6    self-reporting, or about your right of appeal?

7           THE DEFENDANT:  No, Your Honor.

8           THE COURT:  All right.

9           THE DEFENDANT:  Thank you.

10          THE COURT:  Okay.  And the court -- additionally, the

11   government offered three exhibits.  The court didn't rule.  I'm

12   going to accept the three exhibits of the government.  They will

13   be received.

14                            (Government Exhibits 1 through 3

15                             were received in evidence.)

16          THE COURT:  We'll be in recess.

17          MR. PARRISH:  Thank you, Your Honor.

18          (Proceedings concluded at 10:45 a.m.)

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2          I, the undersigned, a Certified Shorthand Reporter of

3     the State of Iowa, do hereby certify that I acted as the

4     official court reporter at the hearing in the above-entitled

5     matter at the time and place indicated.

6          That I took in shorthand all of the proceedings had at

7     the said time and place and that said shorthand notes were

8     reduced to computer transcription under my direction and

9     supervision, and that the foregoing computer transcription pages

10    are a full and complete transcript of the shorthand notes so

11    taken.

12         Dated at Des Moines, Iowa, this 20th day of October,

13    2016.

14

15

16

17                         /s/ Terri L. Martin
                           CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25